UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERYL LYNN GRISWOLD,

            **Plaintiff,**         CIVIL ACTION NO. 13-cv-12546

     **vs.**

                        DISTRICT JUDGE SEAN F. COX

**COMMISSIONER OF**        MAGISTRATE JUDGE MONA K. MAJZOUB
**SOCIAL SECURITY,**

            **Defendant.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff Cheryl Griswold seeks judicial review of Defendant the Commissioner of Society Security's determination that she is not entitled to Social Security benefits for her physical and mental impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 12) and Defendant's Motion for Summary Judgment (docket no. 14). Plaintiff filed a Response to Defendant's Motion. (Docket no. 16.)[1] The motions

---

[1] Pursuant to E.D. Mich L.R. 7.1(d)(3), "[t]he text of a brief supporting a motion or response including footnotes and signatures, may not exceed 25 pages," and "[t]he text of a reply brief, including footnotes and signatures, may not exceed 7 pages." Plaintiff's brief in support of her Motion is 25 pages; thus, it does not violate Local Rule 7.1. Nevertheless, E.D. Mich L.R. 5.1(a)(3) requires that "the type size of all text and footnotes must be no smaller than . . . 14 point (proportional)." Although the Court is unable to discern exactly what font size Plaintiff used in submitting her brief, it is unquestionably smaller than 14 point. Indeed, the majority of Plaintiff's brief appears to be formatted in 11-point font.

More importantly, though, Plaintiff's counsel's attempt to circumvent the page-limit requirement of Rule 7.1 has not gone unnoticed. As noted, Plaintiff's brief, including signatures, extends to the bottom of page 25, pushing Rule 7.1 to its limit. (*See* docket no. 12.) And while an improper font size could be the result of a mistake in formatting, the quoted portions of Plaintiff's brief are significantly smaller than her standard text, appearing to be as small as 8-point or 9-point font. The Court is unaware of any jurisdiction where such formatting would be acceptable. Thus, Plaintiff's failure to follow Local Rule 5.1 appears to be a calculated attempt

have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (Docket no. 4.)  The Court has reviewed the pleadings, dispenses with a hearing pursuant to E.D. Mich. L.R. 7.1(f)(2), and issues this Report and Recommendation.

## I.    RECOMMENDATION:

The Court recommends that Plaintiff's Motion for Summary Judgment (docket no. 12) be GRANTED IN PART AND DENIED IN PART and that Defendant's Motion for Summary Judgment (docket no. 14) be DENIED.  This matter should be remanded for evaluation by a medical expert and a proper determination at Step 3 and, if Plaintiff is not found disabled at Step 3, for proper consideration of Dr. Lerner's opinion, proper discussion of Plaintiff's credibility, and any additional, necessary analysis.

## II.   PROCEDURAL HISTORY:

Plaintiff filed an application for Disability Insurance Benefits with a protective filing date of February 4, 2011, alleging that she had been disabled since July 30, 2004, due to bilateral chondromalacia patella, status post two left ankle surgeries, bilateral carpal tunnel syndrome, neck pain, heel pain, dizziness, depression and Attention Deficit Disorder.  (*See* docket no. 12 at 2.) Plaintiff subsequently amended her alleged onset date to December 1, 2009.  (*See* TR 87.)  The Social Security Administration denied benefits.  (*See* TR 20.)  Plaintiff requested a *de novo* hearing, which was held on January 30, 2012, before Administrative Law Judge (ALJ) Patricia McKay, who subsequently found that Plaintiff was not entitled to benefits because she was capable of performing a significant number of jobs in the national economy.  (TR 20-29.)  The Appeals Council declined

---

to limit her brief to 25 pages.  And while the Court has accepted and considered Plaintiff's arguments herein, Plaintiff's counsel is cautioned that failure to abide by the Local Rules in the future may result in any improper documents being struck from the record or the imposition of sanctions against counsel.

to review the ALJ's decision (TR 1), and Plaintiff commenced this action for judicial review. The

parties then filed their instant Motions.

## III.   PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff sets forth a particularly detailed account of her hearing testimony, which the Court

will adopt as follows:

> . . . Ms. Griswold stated she last worked in July 2004, when she was let go from her position and was caring for her sick mother, and had a lot of problems of her own. (Tr. 48-49). When asked why she could not have worked any jobs in 2009, she stated "I can't figure out what I could do, you know, that would – that I could do for eight hours a day," and the driving alone would make it difficult. (Tr. 72). "I can't sit very long. I can't walk very long or stand for very long," and "I mean it's not that I don't want to work, I just don't know what I would even be able to do." (Tr. 73).
>
> Ms. Griswold stated at the time of her alleged onset in 2009, "[t]hat was after my ankle surgery and my knees were getting so bad," and she was see doctors, getting MRIs, and undergoing physical therapy. (Tr. 50, 78). She was caring for her mother who had a recurrence of cancer, and "when she passed away it took me a while just to even care about doing anything about myself again." *Id.* She stated she did not have her knee surgeries because she could not convalesce while looking after her mother, and "now I think I need new knees, but I never got it fixed, so that's causing me a lot of problems. My knees collapse a lot when I walk. And they just give me pain or else they'll just lock up. I have the water behind my knees all the time," and her pain had been ongoing since at least 2009. (Tr. 51). "[T]here's some days I get up I can't even walk." (Tr. 52).
>
> Ms. Griswold further testified that she broke her leg trying to take her mother to the hospital after a heart attack, and "that started all that spiral with my nerve damage and two surgeries for that." (Tr. 52, 78). She had undergone hardware placement, but it had to be removed due to malfunction, though she felt better when it was in, and "that's what caused the nerve damage. I still have a lot of trouble with that." (Tr. 53, 78). She has neck problems and cannot look down too much or keep her head in one position. (Tr. 55, 77). She reported problems with her hands due to carpal tunnel syndrome and tendonitis. (Tr. 64-65, 77). She takes medication for ADHD and suffers from depression. (Tr. 67, 75-76). Ms. Griswold stated she was "very nervous" at the hearing. (Tr. 38).   Ms. Griswold also has frequent "excruciating headaches," and "a history of migraines, so I don't know if it's the

neck if it's tension, migraines . . . ." (Tr. 78). She has plantar fasciitis that continues to bother her. (Tr. 67). She has back problems than began after 2009. (Tr. 77). She has been unable to afford proper care due to lack of insurance. (Tr. 66).

      Ms. Griswold testified that she cannot sit or stand for long, and "at home I'm mostly on the couch with my feet out, or I lay down. And sometimes I sit up. I usually bend my knees and then I have to keep turning this way or that way. I will sit down some part of the day where I have to have my knees straight for – " (Tr. 55-56). While she was talking about today, a lot of the same things were happening in 2009. (Tr. 56, 80-81). Her pain would sometime be three or four, but would always gradually increase to about 8. (Tr. 80).

      She falls about four times a year, and other times she is able to grab onto something when her knees give out, and this was the same in 2009. (Tr. 64). She stated her problems with tendonitis and her hands began when she broke her arm in 2008 or 2009. (Tr. 67, 75). With regard to her hands, she stated, "As long as they're stable in these [braces] I can grip okay, but I'm not very strong. I can write, but I can't write very long. I get numb. If I don't wear these my wrist is really wobbly and it comes out of the joint, causes me a lot of pain, a lot of pain," and due to her carpal tunnel, she gets "numbness a lot" which was also present "back then." (Tr. 68). She cannot use a cane because of her hands. (Tr. 71). She stated she was getting treatment for depression when she was working, but could not continue medications due to side effects, and she tends to isolate herself. (Tr. 75-76). She stated in 2009 she was having headaches about once a day that would sometimes last the entire day. (Tr. 78-79). The caused her to need to rest, and precluded activities. (Tr. 79).

      Ms. Griswold was in some special education classes beginning in 9th grade due to ADHD. (Tr. 68-69). Her Ritalin sometimes gives her a little trouble with sleep, "but then the pain medicines made me a little nauseous and tired. So I sleep a lot. I sleep at least once or twice during the day, and then I don't sleep very well at night. I wake up three or four times…" (Tr. 69). She was taking the same medications in 2009, and would nap an hour or two twice a day when her mother was lying down due to fatigue. (Tr. 70, 74).

      Regarding her daily activities, in 2009 she was cooking for herself and her mother but it was cooking that did not require her being on her feet for long. (Tr. 59). She performed household chores, but not on a consistent basis. (Tr. 59-63). Ms. Griswold stated in 2009 she could not even get up without experiencing significant pain, could not walk very far, could sit for about an hour, had trouble with bending and climbing stairs, and had trouble with focus and maintaining attention and concentration. (Tr. 80-82). "[M]ost times, even talking to a person I'll start losing the train of thought of it or something. Or watching a movie I'll forget what's going on or not know what's going on." (Tr. 82). She stated she did not the could have worked a job even if she were allowed to change positions periodically. *Id.*

(Docket no. 12 at 9-12.)  Defendant's account of Plaintiff's testimony adds that Plaintiff found it "'very hard' for her to separate her 2009 condition from her current condition" and that during the hearing, when she amended her alleged onset date, she "understood that she gave up 'any claim for benefits prior to that date." (Docket no. 14 at 14 (quoting TR 50, 56, 87).)

### B.     Medical Record

Plaintiff (docket no. 12 at 3-9), Defendant (docket no. 14 at 9-12), and the ALJ (TR 22-24, 26-27) each set out a factual background related to Plaintiff's medical record.  Although focused on different portions of the record, the Court finds that there are no inconsistencies between the three accounts; thus the Court will incorporate them by reference herein.  The undersigned has, however, conducted an independent review of Plaintiff's medical record and will include comments and citations as necessary throughout this Report and Recommendation.

### C.     The Vocational Expert

As with her own testimony, Plaintiff sets out a detailed account of the VE's testimony at her administrative hearing, which the Court will adopt as follows:

> The VE testified Ms. Griswold's past relevant work is as a lab technician, which is classified as light and skilled, and she has no skills that would be transferable. (Tr. 89-90). The ALJ asked the VE to assume a person of the claimant's age, education, and work experience:
>
>> who has the residual functional capacity to perform the full range of light exertional work, but with the following additional limitations: This person needs to limit the use of foot controls with the left, lower extremity to an occasional basis, she can occasionally crouch, and crawl, and kneel, and stoop, or bend, and climb stairs. She needs to avoid workplace hazards such as dangerous, moving machinery, unprotected heights. I'd want to preclude her from climbing ladders as well. And with regard to the upper extremities, she could use her right, dominant, upper extremity for grasping, turning, gross manipulative type of activities on a frequent basis, as opposed to less often like occasionally. And she could use those upper extremities for activities such as fine manipulation which would be writing type

activities, or keyboarding on an occasional basis.

(Tr. 90-91).

The VE testified such a person could not perform Ms. Griswold's past work, but could perform unskilled light work as an office helper, information clerk, and counter clerk. (Tr. 91-93). The VE stated these jobs would offer a sit/stand option. (Tr. 93). He stated the person could also perform sedentary jobs as a credit checker, account clerk, and visual surveillance system monitor, and these jobs would offer a sit/stand option. (Tr. 94). He stated the person could use a 12 inch footrest in these jobs. (Tr. 96-97).

The VE further testified that if the person were likely to be off task 20 percent of the workweek she could still work, but then appears to agree that it would be work preclusive. (Tr. 95-96). He stated Ms. Griswold's testimony regarding "the effects of the pain, and the headaches, and the napping" would be work preclusive. (Tr. 97-98). He stated if the person needed to lie down it would preclude all jobs, and if she needed to elevate her leg waist high, "I think that's an employer accommodation that would need to be made." *Id.* He stated if the person were absent from work more than two or three times a month it would preclude work, and "two days per month would impede the person's ability to maintain employment." (Tr. 100-101). He stated his testimony was consistent with the DOT, but it "does not address sit/stand." (Tr. 98).

(Docket no. 12 at 12.) Defendant sets out a substantially similar account of the VE's testimony but

notes that the VE cited to the following jobs for the hypothetical individual:

28,000 office helper jobs, 29,000 information clerk jobs, and 11,500 counter clerk jobs at the light level of exertion, along with 5,000 credit checker positions, 5,600 charge account clerk positions, and 2,800 visual surveillance system monitor jobs at the sedentary level of exertion in the lower peninsula of Michigan.

(Docket no. 14 at 15 (citing TR 92, 94).)

## IV.    ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff met the insured status requirements of the Act through

December 31, 2009, thirty days after Plaintiff's alleged onset date; that she had not engaged in

substantial gainful activity since December 1, 2009, the date of her alleged onset; and that she had

severe status post left ankle fracture, ORIF, and hardware removal, and degenerative joint disease.

(TR 22.)  The ALJ noted, however, that Plaintiff had other, non-severe impairments, including glaucoma, a splenectomy at age 7, osteopenia, skin cysts, bilateral plantar fasciitis, tendonitis, and affective disorder.  (TR 23.)  The ALJ further found that her impairments did not meet or equal those listed in the Listing of Impairments.  (TR 25.)  The ALJ found, however, that Plaintiff's allegations regarding the extent of her symptoms were not credible and that Plaintiff had the ability to perform light work with the following additional limitations:

> [Plaintiff] is limited to occasional climbing of stairs, crouching, crawling, kneeling, stooping, or bending while avoiding work near hazards such as moving machinery, unprotected heights, and climbing of ladders; occasional use of foot controls with her left lower extremity; frequent use of her dominant right hand for grasping/gross manipulation tasks; and occasional use of her dominant right hand for fine manipulation tasks (such as writing).

(TR 25-27.)  The ALJ then determined, in reliance on the VE's testimony, that Plaintiff was capable of performing a significant number of jobs in the national economy.  (TR 28-29.)  Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act at any time from December 1, 2009,[2] through December 31, 2009.  (TR 29.)

## V.     LAW AND ANALYSIS

### A.     Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal

---

[2]The ALJ's holding states that Plaintiff was not disabled from "July 30, 2004, the alleged onset date, through December 31, 2009."  (TR 29.)  As noted, however, Plaintiff amended her alleged onset date to December 1, 2009; thus, consistent with the remainder of the ALJ's decision, the July 30, 2004 date included in Paragraph 11 of her decision appears to be a typographical error.  Moreover, neither Plaintiff nor Defendant has asserted that the ALJ's holding applies to the period beginning July 30, 2004.

standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525,

528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it

is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938));

*Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases *de novo*, resolve conflicts

in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human*

*Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the

administrative record as a whole.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536

(6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by

substantial evidence, it must be affirmed, even if the reviewing court would decide the matter

differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial

evidence also supports the opposite conclusion.  *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir.

1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial

evidence standard "presupposes that there is a zone of choice within which the decisionmakers can

go either way, without interference by the courts").

###    B.    Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step

sequential analysis.  In the first four steps, Plaintiff was required to show that:

(1)    Plaintiff was not presently engaged in substantial gainful employment; and

(2)    Plaintiff suffered from a severe impairment; and

(3)    the impairment met or was medically equal to a "listed impairment;" or

(4)    Plaintiff did not have the residual functional capacity (RFC) to perform relevant past

work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

## C.    Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at

9

*8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).  Plaintiff argues that this matter should

be reversed or remanded because (1) the ALJ determined at Step 3 that Plaintiff's conditions did not

equal one of the listed impairments without the evaluation of a medical consultant; (2) the ALJ

rejected the opinion of Plaintiff's treating physician without adequate explanation; (3) the ALJ's

determination of Plaintiff's RFC is not supported by substantial evidence; and (4) the ALJ's

credibility determination was flawed.  (Docket no. 12.)

### 1.    The ALJ's Step-3 Determination

Plaintiff asserts that the ALJ's Step-3 analysis requires remand as a matter of law because

the ALJ found that Plaintiff's impairments did not equal those in Listing 1.02 without reliance on

any medical opinion.  (*Id.* at 13.)  In support of her position, Plaintiff notes that

> longstanding policy requires that the judgment of a physician . . . designated by the
> Commissioner on the issue of equivalence on the evidence before the administrative
> law judge or the Appeals Council must be received into the record as expert opinion
> evidence and given appropriate weight.
>
> The signature of a State agency medical . . . consultant [on the appropriate form]
> ensures that consideration by a physician . . . designated by the Commissioner has
> been given to the question of medical equivalence at the initial and reconsideration
> levels of administrative review.

SSR 96-6p, 1996 WL 374180 (S.S.A. 1996).  Here, Plaintiff argues, the only medical consultant who

signed the appropriate form was Michael Cremerious, Ph.D., a psychologist who reviewed

Plaintiff's mental-health evidence.  (Docket no. 12 at 14 (citing TR 113, 118).)  Thus, the ALJ had

no medical opinion regarding Plaintiff's physical condition, and any finding that Plaintiff's

impairments did not

equal one of the listed impairments was flawed.  (*Id.*)  Defendant concedes this point and asserts,

instead, that the ALJ's failure amounts to harmless error.  (*See* docket no. 14 at 16-19.)

Defendant first argues that the burden of proof rests with Plaintiff to "'present medical evidence that describes how [her] impairment is equivalent to a listed impairment'" and asserts that "where an ALJ failed to make specific factual findings required by regulation, . . . 'a reviewing court need only ask whether the record indicates that the claimant's [condition] would have ultimately satisfied the [regulatory] criteria,' at least where that evidence was 'objective, concrete, factual and medical evidence that will be apparent in the record.'" (*Id.* at 16-17 (quoting *Lusk v. Comm'r of Soc. Sec.*, 106 F. App'x 405, 411 (6th Cir. 2004)); *id.* at 17-18 (citing *M.G. v. Comm'r of Soc. Sec.*, No. 10-12957, 2012 WL 954638 (E.D. Mich. Mar. 21, 2012 (Goldsmith, J.)) (quoting *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 637, 656-57 (6th Cir. 2009)).) Defendant contends that "Plaintiff has made no such showing[;] . . . [s]he did not aver that [her impairments] actually equaled a listed impairment, and did not identify any listing that her diagnosed conditions allegedly equaled." (*Id.* at 17; *see also id.* at 18.) Contrary to Defendant's assertion, however, Plaintiff specifically challenges the ALJ's failure to provide any rationale for finding that her impairments did not equal the requirements of Listing 1.02 *and* she argues that the ALJ should have considered Listing 1.06 "pertaining to fractures of the lower extremity with solid union not evident." (Docket no. 12 at 13.)

Defendant also argues that the ALJ's error at Step 3 was harmless because she further found that Plaintiff had the RFC to perform light work with additional restrictions. (Docket no. 14 at 18-19.) Defendant is correct that such a finding must be considered by the Court because if an individual can perform "substantial gainful activity" as the ALJ found in Step 5, then the individual is not precluded from performing "any gainful activity"–the appropriate Step-3 standard. (*See id.* at 19.) Nevertheless, for the reasons discussed *infra*, the undersigned finds that the ALJ's Step-5 analysis is flawed. Therefore, Defendant's instant argument fails.

In sum, while the Sixth Circuit has not specifically addressed this issue, this Court has found

11

that "[t]he great weight of authority holds that a record lacking any medical advisor opinion on equivalency requires a remand." *McPhee v. Commissioner of Social Sec.*, No. 12-13931, 2013 WL 3224420, *16 (E.D. Mich. June 25, 2013) (Steeh, J.) (adopting Report and Recommendation from Hluchaniuk, M.J.) (citations omitted). Thus, notwithstanding Defendant's contention that Plaintiff cannot show that her condition could equal the listing requirements, "'[n]either the ALJ nor this court possesses the requisite medical expertise to determine if [plaintiff]'s impairments . . . equal one of the Commissioner's listings.'" *Id.* at *17 (quoting *Freeman v. Astrue*, 2012 WL 384838, at *4 (E.D. Wash. Feb. 6, 2012)). As this Court has acknowledged, "'SSR 96-9p treats equivalence determinations differently from determinations as to whether an impairment meets a listing, requiring expert evidence of the former, but not the latter.'" *Wladysiak v. Comm'r of Soc. Sec.*, No. 11-14494, 2013 WL 2480665, *14 (E.D. Mich. June 10, 2013) (citing *Stratton v. Astrue*, __ F.Supp.2d __, 2012 WL 1852084, *12 (D.N.H. 2012)). Therefore, the undersigned recommends remanding this matter for evaluation by a medical expert and a proper determination at Step 3.

### 2.     The ALJ's Assessment of the Medical Opinions of Record

Plaintiff asserts that the ALJ erred when she rejected the opinion of Plaintiff's treating physician, Dr. Lerner, merely because the opinion was retrospective. (Docket no. 12 at 17-21.) Defendant argues that "[c]ontrary to Plaintiff's assertion, the ALJ did not object to the fact that Dr. Lerner identified a date long in the past as the onset of Plaintiff's symptoms. Instead, the ALJ considered and criticized Dr. Lerner's lack of first-hand knowledge of Plaintiff's condition prior to the time he first saw her."[3] (Docket no. 14 at 20-21.)

---

[3]Defendant further argues that"[t]he ALJ also objected to Dr. Lerner's opinion because two completely different handwriting types were used on them[;] . . . [t]hus, the ALJ questioned

If accurate, Defendant's argument would be compelling, but the ALJ found as follows:

> Although the claimant and her representative cite the opinion of Dr. Lerner as proof that she claimant is disabled, the undersigned does not find this assessment compelling. Although Dr. Lerner backdates this assessment to a period "3-4 years" ago, the evidence indicates that Dr. Lerner did not begin treating the claimant until August of 2011, well after her date last insured. The undersigned also considered that this form appears to have been completed by two different people with two very different handwriting styles. Even though Dr. Lerner purportedly reviewed the treatment records of Drs. Arbit and Kamil, the undersigned finds that Dr. Lerner's assessment is not probative in determining whether the claimant was disabled prior to December 31, 2009.

(TR 26-27 (citations omitted).) Thus, contrary to Defendant's assertion, the ALJ specifically found that Dr. Lerner's opinion was "not probative in determining whether [Plaintiff] was disabled prior to December 31, 2009," because "Dr. Lerner backdate[d] his assessment."[4] (*Id.*) Therefore, the issue before the Court is not whether the ALJ made such a determination but whether such a determination was appropriate.

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). But it is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician.

---

the authorship of the opinions." (*Id.* at 21.) But as Plaintiff notes, not only did Dr. Lerner sign the form adopting all of the findings, "[e]ven had the ALJ 'objected' to the handwriting as creating some sort of ambiguity, clarification would be required before leaping to an assumption that the opinion expressed was not in fact that of Dr. Lerner." Defendant's argument in this regard is without merit.

[4]Even if the Court were to accept Defendant's reading of the ALJ's decision with regard to Dr. Lerner's opinion as one possible interpretation, such a finding evidences the unclear nature of the ALJ's discussion, which in itself would require remand. *See Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)) (discussing the clarity required in the ALJ's decision with regard to medical opinions).

*Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008). Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight." *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)). The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant. 20 C.F.R. § 404.1527(c)(1). The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist. 20 C.F.R. §404.1527(e). Notably, "neither a treating nor examining physician's opinion should be dismissed merely because it is retrospective." *Engel v. Comm'r of Soc. Sec.*, No. 08-12854, 2010 WL 4539468 (E.D. Mich. Sept. 29, 2010) (citing *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981)). Instead, as Plaintiff states, "a retrospective opinion which relates back to the insured period 'may be considered proof of disability' as long as 'it is corroborated by evidence contemporaneous with the eligible period.'" (Docket no. 12 at 19 (quoting *Wladysiak v. Comm'r of Soc. Sec.*, 2013 WL 2480665, *11).)

In response to Plaintiff's contention, Defendant argues that there was no "evidence contemporaneous with the eligible period" because the eligible period was only from December 1, 2009 (the amended alleged onset date) to December 31, 2009 (the date last insured), and Plaintiff did not see a doctor during this time period. (Docket no. 14 at 21-22.) Moreover, Defendant asserts, "to the extent that Plaintiff had impairments prior to December 1, 2009, she admitted that those problems were not of a disabling severity prior to that date" when she "waived any claim that she was disabled/entitled to DIB at any time prior to December 1, 2009." (*Id.* at 22.) While Defendant's argument is compelling, it misses the point.

The ALJ *did* find that Plaintiff suffered from severe impairments during the relevant time

period (TR 22) and then chose to reject Plaintiff's treating physician's opinion with regard to the

limitations related to those impairments.  And regardless of Defendant's rationale for the ALJ's

rejection, the Commissioner requires its ALJs to "always give good reasons in [their] notice of

determination or decision for the weight [they] give [a] treating source's opinion."  20 C.F.R. §

404.1527(c)(2).  Those good reasons must be "supported by the evidence in the case record, and

must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator

gave to the treating source's medical opinion and the reasons for that weight."  *Wilson v. Comm'r*,

378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188,

at *5 (1996)).  If the opinion of a treating source is not afforded controlling weight, an ALJ must

apply certain factors in determining what weight to give the opinion, including the length of the

treatment relationship and the frequency of examination, the nature and extent of the treatment

relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and

the specialization of the treating source.  *Wilson*, 378 F.3d at 544 (citation omitted).  Even then, a

finding that a treating-source medical opinion is not well supported by medically acceptable clinical

and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case

record means only that the opinion is not entitled to controlling weight, not that the opinion should

be rejected.   Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.  Defendant's post-hoc

rationalization is insufficient where the ALJ gave no good reasons for dismissing Dr. Lerner's

opinion in its entirety, particularly where the ALJ failed to discuss any of the regulatory factors.  *See*

*Christephore v. Commissioner of Social Sec.*, No. 11-13547, 2012 WL 2274328, *6 (E.D. Mich.

June 18, 2012) (Roberts, J.) ("[I]t is not the Court's job to conduct a *de novo* review of the evidence

or to rubber stamp the ALJ's decision. The Court must ensure both that the ALJ applied the correct

legal standard and that his decision is supported by substantial evidence.  Moreover, it is the ALJ's

rationale that is under review, not defense counsel's.).  Defendant argues that "Plaintiff does not identify any factor that the ALJ allegedly failed to consider" (docket no. 14 at 24), but the ALJ failed to consider *any* of the regulatory factors.

Notably, the Sixth Circuit has upheld the decision of an ALJ which gave less than controlling weight to a treating physician without specifically analyzing the factors set forth in 20 C.F.R. § 404.1527(c) where the ALJ provided "good reason" for the decision.  *See Infantado v. Astrue*, 263 Fed.Appx. 469, 473-74 (6th Cir. 2008).  There is no per se rule that requires an articulation of each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)(2)-(6).  *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)).  Moreover, an ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute harmless error (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation."  *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson v. Comm'r*, 378 F.3d 541, 547 (6th Cir. 2004)).  The matter at hand, however, does not meet these requirements.  Therefore, the Court should remand this matter for proper consideration of Dr. Lerner's opinion.

### 3.    The ALJ's Assessment of Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997).  But credibility assessments are not insulated from judicial review.  Despite the deference that is due, such a

determination must nevertheless be supported by substantial evidence.  *Id.*  An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"  *Id.*  "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2).  The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain.  *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

Here, the ALJ found as follows:

The evidence indicates . . . that during the time period since the claimant stopped working in 2004 and until just a few months prior to the expiration of her insured status, the claimant was primarily caring for her mother, who had suffered a heart attack in March 2008, and was later diagnosed with cancer; the claimant's mother passed away in August of 2009.

17

> Although the claimant maintains that she was disabled and unable to work from her amended onset date of December 1, 2009 through December 31, 2009, she remained able to operate a snow blower in March of 2008. This is well after her original alleged onset date of disability in 2004. Furthermore, at the hearing, the claimant testified that she had been using a self-propelled lawn mower.
>
> The claimant has recently asserted that her condition has remained relatively stable. In addition, in an office visit dated June 29, 2010, the claimant reported that she was doing okay and did not have any complains. The undersigned finds that this further undermines the claimant's allegations of disability prior to her date last insured.

(TR 26.) Plaintiff asserts that the ALJ's credibility finding is flawed because she "focused on [Plaintiff's] ability to serve as a caregiver for her mother, her ability to operate a snow blower in March 2008, her ability to operate a self-propelled lawn mower, and her statement in June 2010 that she was 'doing okay and did not have any complaints'" and that she "failed to consider the intermittent nature of these activities." (Docket no. 12 at 24 (quoting TR 26).)

Defendant first argues that the ALJ "is supposed to consider a claimant's daily activities," and therefore, his consideration of Plaintiff's ability to care for her mother, use a snowblower, and use a lawn mower was appropriate. (Docket no. 14 at 26.) Defendant is correct, but as Plaintiff points out, she does not take issue with the ALJ's consideration of these activities but with her failure to consider the intermittent nature of the activities. (Docket no. 16 at 6-7.) Specifically, Plaintiff states that she told the ALJ that her caregiving included "trying to cook," including mostly meals that did not require being on her feet; giving her mother medications; and taking her in for medical treatment. She elaborated that these activities were not done consistently. (*See* docket no. 12 at 24.) Plaintiff further notes that she mowed her lawn three times over one summer and that it took her "two days or so" to get it done because she was constantly taking breaks; she added that she only used her snowblower on occasion. (*See id.*)

Defendant then asserts that "because Plaintiff was not disabled while her mother was alive,

the fact that she did not perform her activities consistently or continuously during that time period . . . had no bearing on whether she was disabled" and follows this assertion by arguing that "[t]he fact that Plaintiff had the same problems before her mother died . . . and that she had difficulty distinguishing her 2009 condition from her subsequent condition, suggested that her long-standing conditions remained the same and continued at a non-disabling level." (Docket no. 14 at 27.) Thus, Defendant contends that the ALJ appropriately considered Plaintiff's prior condition and her daily activities in determining that she was not disabled, but it would have been inappropriate for her to consider the nature of those activities because they "had no bearing" as a prior condition. Defendant's argument is not well taken and is, in itself, telling: the ALJ's decision does not make clear the weight he gave Plaintiff's statements or the reasons for that weight.  Either the ALJ considered Plaintiff's prior conditions and limitations or she did not.

Finally, Defendant contends that the ALJ appropriately relied on Plaintiff's 2010 statements that she was "doing ok" and had "no complaints" because "there was no evidence of Plaintiff's condition during the month of December 2009[; t]hus, the ALJ had not choice but to [consider this evidence]." (*Id.* at 27.)  But as Plaintiff asserts, these statements were made to Dr. Kim, Plaintiff's treating psychiatrist, and therefore, the statements are not related to her complaints of physical pain related to her ankle, knees, and wrists.  (Docket no. 12 at 24-25.)

As Plaintiff concedes, the ALJ did not err by considering any of these factors when determining Plaintiff's credibility.  The undersigned finds, however, that the ALJ did err when he failed to consider the nature of Plaintiff's activities and failed to explain how Plaintiff's statement to her psychiatrist impugned her credibility with regard to her physical symptoms.  Moroever, other than discussing some intermittent activities from 2008 and early 2009, the ALJ did not discuss any

19

of the regulatory factors set forth in 20 C.F.R. § 416.929(c)(3).  In short, the ALJ's credibility determination is supported by some evidence, but the undersigned finds that this evidence is not substantial.  At most, it is a scintilla of evidence, and this matter should be remanded for a proper discussion of Plaintiff's credibility.

### 4.      Plaintiff's RFC

Plaintiff argues, in general, that the ALJ's RFC determination was improper, but the ALJ is only required to incorporate in a claimant's RFC (and the hypothetical questions to the VE) those limitations that the ALJ finds credible and supported by the record.  *See Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).  Here, the ALJ included in Plaintiff's RFC those limitations that she found credible.  Thus, in substance, Plaintiff's assertion that the RFC is inaccurate is merely a collateral attack on the ALJ's decision not to credit Plaintiff's testimony and his determination with regard to Dr. Lerner's opinion, both of which are addressed by Plaintiff's prior arguments.

## VI.      CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 12) should be GRANTED IN PART AND DENIED IN PART and Defendant's Motion for Summary Judgment (docket no. 14) should be DENIED.  This matter should be remanded for evaluation by a medical expert and a proper determination at Step 3 and, if Plaintiff is not found disabled at Step 3, for proper consideration of Dr. Lerner's opinion, proper discussion of Plaintiff's credibility, and any additional, necessary analysis.

### REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: August 14, 2014              s/ Mona K. Majzoub
                                    MONA K. MAJZOUB
                                    UNITED STATES MAGISTRATE JUDGE


### PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: August 14, 2014              s/ Lisa C. Bartlett
                                    Case Manager